UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

IRSHAD AHMID,

               Defendant.

------------------------------------X

10 Cr. 195-03 (RWS)

SENTENCING OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/28/11

**Sweet, D.J.**

      On September 16, 2011, Irshad Ahmid, ("Ahmid" or "Defendant") pleaded guilty to one count of conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1029(b)(2). For the reasons set forth below, Ahmid will be sentenced to 12 months' imprisonment to be followed by three years' supervised release.  Ahmid will also be required to pay a special assessment of $100, make restitution as described below and forfeit to the United States all property, real and personal, involved in the offense or traceable to such property.


**Prior Proceedings**


      On March 10, 2010, Indictment 10 CR 195-03 (RWS) was

filed in the Southern District of New York. Count One charges that from at least January 2006 through September 2009, in the Southern District of New York and elsewhere, Mohammad Janjua, Tariq Ahmed, the Defendant Irshad Ahmid, and others conspired to commit credit card fraud, in violation of 18 U.S.C. § 1029(b)(2). Count Two charges that from at least January 2006 through September 2009, Mohammad Janja, Tariq Ahmed, and the Defendant trafficked in and used fraudulent credit cards during a one-year period, and by such conduct obtained things of value aggregating $1,000 and more during that period, in violation of 18 U.S.C. §§ 1029(a)(2). Count Three charges that from at least January 2006 through September 2009, Mohammad Janjua, Tariq Ahmed, and the Defendant committed credit card fraud with one or more credit cards which were issued to other persons to receive payment and other things of value during a one-year period, the aggregate value of which was equal to and greater than $1,000, in violation of 18 U.S.C. §§ 1029(a)(5). Count Four charges that from at least January 2006 through September 2009, in the Southern District of New York and elsewhere, Mohammad Janjua and Tariq Ahmed possessed the names, social security numbers, and other personal identification information of other persons in conspiring to commit and committing credit card fraud, as charged in Counts One, Two and Three, in violation of 18 U.S.C.

2

§ 1028A.

The Indictment included a Forfeiture Allegation, stating that as a result of committing one or more of the credit card fraud offenses charged in Counts One, Two and Three, Mohammad Janjua, Tariq Ahmed and the Defendant shall forfeit to the United States any personal property used or intended to be used to commit the offenses charged in Counts One through Three, in accordance with 18 U.S.C. §§ 1029(c)(1)(C) and (c)(2) and 21 U.S.C. § 853. The Indictment also included a Substitute Asset Provision, stating that if, as a result of any act of the Defendant, any of the forfeitable property could not be located, had been transferred to a third person, had been placed beyond the jurisdiction, had substantially diminished in value, or had been commingled with other property, it is the intent of the United States to seek forfeiture of any other property of the Defendant up to the value of the forfeitable property, in accordance with 21 U.S.C. § 982(b) and 21 U.S.C. § 853(p).

On September 16, 2011, Ahmid allocuted to Count One only in accordance with the terms of a written plea agreement stipulating that the applicable Guideline offense level was 13, that Ahmid was in Criminal History Category I, that a sentence

in the Guidelines range was appropriate, and that neither party would seek a sentence outside of the Guideline range.

Sentencing is scheduled for November 3, 2011.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed —
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical

care, or other correctional treatment in the
most effective manner;

(3)   the kinds of sentences available;

(4)   the kinds of sentence and the sentencing range
established for —

(A)   the applicable category of offense committed
by the applicable category of defendant as
set forth in the guidelines . . .;

(5)   any pertinent policy statement . . . [issued
by the Sentencing Commission];

(6)   the need to avoid unwarranted sentence
disparities among defendants with similar
records who have been found guilty of
similar conduct; and

(7)   the need to provide restitution to any victims of
the offense.

18 U.S.C. § 3553(a).   A sentencing judge is permitted to find

all the facts appropriate for determining a sentence, whether

that sentence is a so-called Guidelines sentence or not.   See

Crosby, 397 F.3d at 114-15.


In light of the Court's statutory responsibility "to

'impose a sentence sufficient, but not greater than necessary'

to accomplish the goals of sentencing," Kimbrough v. United

States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)),

and having considered the Guidelines and all of the factors set

forth in § 3553(a), it is determined that a Guidelines sentence

is warranted in the instant case.

## The Defendant

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Ahmid's personal and family history.

## The Offense Conduct

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that report.

Since at least 2007, FBI agents, the New York State Attorney General's Office and other law enforcement agencies investigated a credit card fraud ring operating in New York City. The ring operated in part from a company called "Nazir Associates," which was located at 39-04 43rd Avenue in Queens, New York (The "Nazir Associates Fraud Ring" or the "Fraud Ring"). In about 2006, Nazir Associates maintained an office at 45 West 34th Street in Manhattan, New York.

Nazir Associates purported to provide services to customers who needed to "repair" their credit. Through their association with this business, members of the Nazir Associates Fraud Ring were able to obtain the personal identification information of others. As part of this scheme, the members of the Fraud Ring obtained the personal identification information of, among others, individuals who had no legal immigration status in the United States. The Fraud Ring's members then exploited the information after those individuals were deported from, or otherwise left, the United States.

Hassan Choudhry worked at Nazir Associates. Since at least 2006, individuals at the company engaged in large-scale identity theft and credit card fraud. Among other things, the defendants would use customers' personal identification information without the customers' permission in order to obtain credit cards in those individuals' names and/or to make fraudulent charges using those customers' credit cards.

Mohammad Janjua was one of the owners of Nazir Associates. As will be described in detail below, Janjua met with a cooperating witness and agreed to, and did, make collusive charges using credit cards in the names of other

7

people.  In addition, Janjua offered the cooperating witness the opportunity to purchase several files consisting of personal information of other people.

The Government obtained information about the Nazir Associates Fraud Ring from various sources, including but not limited to, cooperating witnesses, surveillance, court-authorized intercepted wire calls, an undercover agent and financial records.

Persons committing access device fraud frequently traffic in what are called "files."  A "file" typically consists of several pieces of personal identification information of an individual, and may include a person's name, address, Social Security number, birth date, mother's maiden name and phone number.  A "file" may also include a credit report and credit cards in an individual's name.  Credit card fraud rings buy and sell "files" with the intent that individuals buying the "files" will use them to obtain credit cards in other individuals' names, use those credit cards to purchase items, make collusive charges and obtain cash advances, and then default on the unpaid balances of the credit cards.  This process is sometimes referred to as "busting out" a "file."

Those committing access device fraud frequently engage in "collusive charges." Through this scheme, a merchant colluding with a person who obtained fraudulent and/or unauthorized credit cards agreed to charge those credit cards for fictitious services. The merchant's account is credited, and the merchant pays a portion of the proceeds to the person who provided the fraudulent and/or unauthorized credit cards.

Law enforcement officers debriefed a cooperating witness (CW-1) who engaged in credit card fraud transactions with members of the Nazir Associates Fraud Ring. Based on information from those officers and CW-1, the following was learned:

        (a)   CW-1 was engaged in credit card fraud from at least 2005 until August 2007 and, as part of his criminal activity, he bought files and made collusive charges, including with members of the Nazir Associates Fraud Ring.

        (b)   CW-1 had known Mohammad Janjua since at least 2005. From about 2005, up to 2007, CW-1 made approximately \$100,000 in collusive charges with

Janjua.   Those charges were incurred at Nazir Associates, both when the business was located in Queens, New York, and when it was located in Manhattan, New York.

(c)   In 2006 (prior to his cooperation), CW-1 met with Janjua and another individual at Nazir Associates in Queens, New York, in order to purchase files from that individual.   In June 2009, CW-1 was shown several photographs of individuals associated with and/or surveilled at Nazir Associates, including a photograph of Irshad Ahmid.   CW-1 identified Ahmid as the individual from whom CW-1 purchased files in 2006.

(d)   During the 2006 meeting with Janjua and Ahmid, CW-1 purchased from Ahmid two files in the names of individuals identified herein as "Jameel" and "Raju."   CW-1 agreed to pay Ahmid approximately $12,000 to $14,000 for each of the two files. That money was to be paid to Ahmid through collusive charges made by Janjua.   CW-1 also received a percentage of the collusive charges made using the "Jameel" and "Raju" files.

Based on the information provided by CW-1, law enforcement officers obtained a credit report for "Jameel," which listed 218 Grande Street, Jersey City, New Jersey as one of his previous addresses.  Officers also obtained a credit report for Irshad Ahmid, showing that one of his previous addresses was also 218 Grand Street, Jersey City, New Jersey. Individuals who commit credit card fraud sometimes list their own addresses as the mailing address of record for a "file" in order to be able to receive mail and credit cards for which they fraudulently applied in other names.

In the course of the investigation, the officers determined that 845 Bergen Street, Jersey City, New Jersey was an address associated with the "Raju" file.  According to United States Postal Service records, there was an order on file with the Post Office to forward all mail from the Bergen Street address to an "Arshad Ahmid" at 213 Summit Avenue, Jersey City, New Jersey.  According to credit reports obtained for Irshad Ahmid, 213 Summit Avenue, Jersey City, New Jersey was a previous address for Ahmid.

The investigation further indicated that the "Raju" and "Jameel" files had been used for fraud.  Documents obtained

from credit reporting agencies reflected more than $180,000 in defaulted and/or overdue credit card charges on the accounts of "Raju" and "Jameel."

Law enforcement officers debriefed another cooperating witness (CW-2) who formerly worked with Mohammad Janjua and his brother, Tariq Ahmed. As part of the investigation into the Nazir Associates Fraud Ring, CW-2 made more than 50 consensual audio and video recordings of meetings and phone calls with members of the Fraud Ring. From speaking with CW-2 and from reviewing consensually made audio and video recordings involving CW-2, law enforcement officers learned the following:

(a)   CW-2 has seen Irshad Ahmid at Nazir Associates multiple times throughout 2008 and 2009. At a meeting in about December 2008, Ahmid gave CW-2 a copy of his driver's license, which listed Ahmid's address as 845 Bergen Street, the same address associated with the "Raju" file.

(b)   In about early 2009, Mohammad Janjua attempted to sell CW-2 several files, including files in the names of two individuals identified herein as "Parveen" and "Qassar." Janjua provided a copy

12

of a credit report for "Qassar" which listed one of Qassar's addresses as 213 Summit Avenue, in Jersey City, New Jersey, the same address to which mail was being forwarded to the attention of "Arshad Ahmid."

Based on information provided by CW-2, officers obtained a credit report for "Parveen," which listed one of "Parveen's" addresses as 845 Bergen Street, the same address from which mail was being forwarded to the attention of "Arshad Ahmid."

From speaking with CW-2 and from reviewing consensually made audio and video recordings involving CW-2, law enforcement officers learned the following:

    (a)  In November 2008, as part of the investigation into the Fraud Ring, the FBI provided CW-2 with two credit cards in the names of fictitious individuals (the November Credit Cards).

    (b)  On November 17, 2008, CW-2 met with Tariq Ahmed and Mohammad Janjua at Nazir Associates in Queens, New York. This meeting was recorded by

13

CW-2.   During the meeting, CW-2 provided Ahmed
and Janjua with the November Credit Cards.

(c)   On November 18, 2008, CW-2 placed a consensually
recorded phone call from Manhattan to Ahmed.
During that conversation, CW-2 and Ahmed
discussed, among other things, collusive charges
that Ahmed had made, and attempted to make, on
the November Credit Cards.

(d)   Throughout November 2008, fraudulent charges were
made on the November Credit Cards.

(e)   In November and December 2008, Ahmed paid CW-2 at
least $6,700 in connection with collusive charges
made on the November Credit Cards.   CW-2
sometimes was paid in United States currency.   At
least once, however, CW-2 was paid by Ahmed with
two checks drawn on an account in the name "Rabia
International Corp."

From reviewing billing statements and other records
for the November Credit Cards, law enforcement officers learned
the following:

(a)   More than $9,000 was charged on the November

14

Credit Cards during November 2008.

(b)   The charges were credited to the accounts of "MS Superfocus" and "Rabia International."

The agents reviewed records from the New York Department of State. Those records indicated that MS Super Focus and Rabia International were registered in New York as corporations, and listed 45 West 34th Street as the address to which process should be served for each company. That was the same address at which Nazir Associates' Manhattan office was located.

From speaking with CW-2, and from reviewing consensually made audio and video recordings involving CW-2, law enforcement officers learned the following:

(a)   On February 18, 2009, Mohammad Janjua met with CW-2 at a location in Manhattan, New York. The meeting was recorded by CW-2. At that meeting Janjua agreed to provide at least two files to CW-2 in the names of individuals identified herein as "Amjad" and "Ameen" in exchange for $10,000. Janjua also gave CW-2 a mobile phone

15

which was under the name "Ameen," so that CW-2 could service "Ameen's" credit card.

(b)     At the FBI's direction, CW-2 gave Janjua $4,000 in United States currency as partial payment for the "Amjad" and "Ameen" files.

(c)     On February 24, 2009, CW-2 met with Ahmed and Hassan Choudhry at Nazir Associates in Queens, New York.  The meeting was recorded by CW-2. During that meeting, Choudhry gave CW-2 the personal identification information of "Ameen" and "Amjad," including Social Security numbers, dates of birth, and email addresses.   Choudhry also gave CW-2 a copy of a phone bill in "Ameen's" name.

From speaking with CW-2 and from reviewing consensually made audio and video recordings involving CW-2, law enforcement officers learned the following:

(a)     On March 4, 2009, while traveling in a car in Manhattan, New York, Mohammad Janjua offered CW-2 the opportunity to purchase files in the names of six individuals.  This conversation was recorded

16

by CW-2.   Janjua estimated the files he showed
CW-2 were worth between $300,000 and $400,000.

    (b)   Janjua gave the files to CW-2 so that CW-2 could
review them and decide whether to purchase them.
CW-2   provided   the   files   to   FBI   agents   in
Manhattan, New York, and the FBI made copies of
each file.

    (c)   CW-2 later returned the files to Janjua and told
Janjua that CW-2 was not interested in purchasing
them.

      In April 2009, the FBI introduced an undercover agent
("UC") purportedly interested in selling files to members of the
Nazir Associates Fraud Ring.   On April 2, 2009, Mohammad Janjua
met with the UC in Manhattan, New York.   The UC recorded the
meeting.   During that meeting, the UC agreed to sell Janjua 18
files so that Janjua could use them for credit card fraud.   The
UC also agreed to give Janjua two credit cards to begin their
relationship.   Janjua agreed to maek collusive charges using
those cards, and to give the UC a portion of the proceeds from
those collusive charges.   As described in more detail below, CW-
2 later gave those two credit cards to Tariq Ahmed.

From speaking with CW-2 and from reviewing consensually made audio and video recordings involving CW-2, law enforcement officers learned the following:

(a)   In April 2009, the FBI provided CW-2 with two credit cards which were purportedly from the UC, in the names of fictitious individuals (the "April 2009 Credit Cards").

(b)   On April 9, 2009, CW-2 met with Tariq Ahmed at Nazir Associates and gave Ahmed the April 2009 Credit Cards.  Referring to the 18 files the UC had agreed to sell to Mohammad Janjua, Ahmed asked, "Is this from that eighteen?"  CW-2 explained that the cards were separate from those 18 files.

(c)   Ahmed also asked, "How much is there on these two?" referring to the available credit amount on each of the April 2009 Credit Cards.  CW-2 told him each card had $5,000 of available credit.

(d)   Throughout April and May 2009, CW-2 was paid at least $1,200 by Ahmed for collusive charges made using the April 2009 Credit Cards.

From the agent's review of billing statements and other records regarding the April 2009 Credit Cards, it was learned that at least $10,000 was charged to those cards. The charges were credited to accounts in the name of "Rabia International" and "Rabia Forex."

Records from the New York Department of State indicate that "Rabia Forex" is registered as a corporation in New York, and lists 45 West 34th Street, New York, New York as the address to which process should be served for "Rabia Forex." That address is the same address at which Nazir Associates Manhattan office was located.

Law enforcement officers learned the following from speaking with CW-2:

(a) Mohammad Janjua and Tariq Ahmed repeatedly acknowledged to CW-2 that they sell and use the personal identification information of other individuals.

(b) On February 26, 2009, during a recorded conversation, Ahmed explained that the people "were here . . . just left," meaning that the

19

people previously were in the United States but had since left the country. When CW-2 asked whether the people could return to the United States, Ahmed explained, "They can't make it back, not on this name. They cannot make it back on this name, Social Security number, or date of birth. If they return under a different name, that is a different story."

(c) CW-2 also asked Ahmed whether he had bought this information from the individuals. Ahmed responded, "No, of course I did not buy them. They had come to me to get their problems taken care of." When CW-2 asked why these people left the United States, Ahmed explained, "They just did not have green cards, buddy."

(d) In March 2009, Ahmed and Janjua discussed with CW-2 the possibility of changing the addresses associated with certain files. One of those files was in the name of an individual identified herein as "Mahboob." At the direction of the FBI, CW-2 provided Ahmed and Janjua with an address in the Bronx, New York (the "Bronx Address") for the purpose of having mail

20

delivered to that address in connection with the credit card fraud scheme.  The Bronx Address was in fact an address monitored and controlled by the FBI.  Subsequently, mail in "Mahboob's" name was delivered to the Bronx Address and recovered by the FBI.

(e)  On May 7, 2009, CW-2 met with Janjua and delivered to him mail in "Mahboob's" name.  That meeting was recorded by CW-2.  During the meeting, CW-2 asked Janjua, "Does this person exist?"  Janjua responded, "Yes he does."  CW-2 later asked "So is this a genuine person or is he dead?"  Janjua responded, "Yes he is a genuine person."  When CW-2 asked where the person was, Janjua responded, "He's gone, it's a real person, real person."  Janjua's response meant that "Mahboob" was a real person who had left the United States.

(f)  In June 2009, Ahmed gave CW-2 $50 and asked CW-2 to pay a credit card bill in the name of an individual identified herein as "Abid."  CW-2 subsequently paid "Abid's" credit card bill. Mail addressed to "Abid" also was retrieved from

21

the Bronx Address.   CW-2 delivered that mail to members of the Nazir Associates Fraud Ring.

Based on the information that CW-2 provided regarding "Mahboob," law enforcement officers obtained records regarding "Mahboob" from the Social Security Administration and confirmed that "Mahboob" was issued a valid Social Security number. Officers also learned from the New York State Department of Motor Vehicles that "Mahboob" was issued a New York State driver's license.   This information corroborated the statement of Mohammad Janjua that "Mahboob" was a "real person."

Based on the information that CW-2 provided regarding "Abid," law enforcement officers obtained records from Immigration and Customs Enforcement regarding "Abid."   Those records revealed that "Abid" was deported in 1999.   This information corroborates the statements of Tariq Ahmed that the Nazir Associates Fraud Ring obtains information from individuals and, after those individuals are deported or otherwise leave the United States, use that information to commit credit card fraud.

The total loss attributable to the offense is $687,170.36.   This calculation is based on total charges run

22

through credit card merchant machines located at Nazir Associate's offices. Those machines revealed charges of $424,513.04; $77,310.75; $46,234.09; and $139,112.48 in the names of various businesses established by the Nazir Associates Fraud Ring. The amount of $454,943.99 represents the restitution amount for which the Government was able to identify specific victims with respect to those charges. Additionally, the Government has identified 21 victims.

Mohammad Janjua was arrested on September 30, 2009. The parties have stipulated that Janjua was a manager or supervisor of the conspiracy. Tariq Ahmed was arrested on September 30, 2009. Hassan Choudhry was arrested on September 30, 2009. Irshad Ahmid was arrested on April 6, 2011.

**The Relevant Statutory Provisions**

Pursuant to 18 U.S.C. § 1029(b)(2), the maximum term of imprisonment is 7 ½ years.

If a sentence of imprisonment is imposed, the Court may impose a term of supervised release of not more than three years per count, pursuant to 18 U.S.C. § 3583(b)(2).

The Defendant is eligible for probation of not less than one nor more than five years per count, pursuant to 18 U.S.C. § 3561(c)(1).

The maximum fine that may be imposed is $250,000 per count, pursuant to 18 U.S.C. § 3571(b)(3).  A special assessment of $100 per count is mandatory pursuant to 18 U.S.C. § 3013.

Full restitution to the victim is required under 18 U.S.C. § 3663A and 18 U.S.C. § 3664.  Pursuant to 18 U.S.C. §§ 982 and 1029, the Defendant shall forfeit to the United States all property real and personal involved in the offense or traceable to such property.

**The Guidelines**

The November 1, 2010 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a).  The Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment are as follows:

24

The guideline for the violation of 18 U.S.C. § 1029 is found in § 2B1.1. According to § 2B1.1(a)(2), the base offense level for the instant offense is six. Pursuant to §2B1.1(b)(1)(E), because the loss attributable to the Defendant is more than $70,000, but not more than $120,000, an increase of eight levels is applicable. Pursuant to §2B1.1(b)(10)(A), because the offense involved the possession and use of an authentication feature, an increase of two levels is applicable. Therefore, the base offense level is 16. Based on his plea allocution, the Defendant has shown recognition of his responsibility for the offense. Pursuant to § 3E1.1(a), the offense is reduced two levels. Furthermore, an additional one-level reduction is warranted, pursuant to § 3E1.1(b), because Defendant gave timely notice of his intention to enter a plea of guilty for an offense with a base level of 16 or greater, thereby permitting the Government to allocate its resources more efficiently. Accordingly, the applicable offense level is 13.

The Defendant has no known criminal convictions. Therefore, the Defendant has zero criminal history points and a Criminal History Category of I.

25

Based on a total offense level of 13 and a Criminal History Category of I, the Guidelines range for imprisonment is 12 to 18 months. The Guidelines range for a term of supervised release is two to three years, pursuant to § 5D1.2(a). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to § 5D1.1(b). Supervised release is required if the Court imposes a term of imprisonment of more than one year or when required by statute, pursuant to § 5D1.1(a). Because the applicable Guidelines range is in Zone C of the Sentencing Table, the Defendant is not eligible for probation, pursuant to § 5B1.1, application note #2.

The fine range for the instant offense is $3,000 to $30,000, pursuant to § 5E1.2(c)(3). Subject to the Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,357.01 to be used for imprisonment, a monthly cost of $328.20 for supervision, and a monthly cost of $2,153.22 for community confinement. Pursuant to § 5E1.1(a)(1), in cases where there are identifiable victims,

the Court shall enter a restitution order for the full amount of the victim's loss if such order is authorized under 18 U.S.C. § 3663A.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.  Upon consideration of all of the relevant factors, it is concluded that the imposition of a Guideline sentence is warranted.

## The Sentence

For the instant offense, Ahmid will be sentenced to 12 months' imprisonment and three years' supervised release.

Ahmid is directed to report to the nearest United States Probation Office within 72 hours of release to commence his term of supervised release.  It is recommended that Ahmid be

supervised by the district of his residence.

As mandatory conditions of his supervised release, Ahmid shall:

> (1) not commit another federal, state, or local crime;
>
> (2) not illegally possess a controlled substance;
>
> (3) not possess a firearm or destructive device; and
>
> (4) cooperate in the collection of DNA as directed by the probation officer.

Mandatory drug testing is suspended based on the Court's determination that the Defendant poses a low risk of future substance abuse.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special conditions:

> (1) The Defendant shall provide the probation officer with access to any requested financial information.

28

(2)   The Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in reasonable manner. Failure to submit to a search may be grounds for revocation. The Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

(3)   The Defendant shall be prohibited from engaging in an occupation, business or profession which requires him to have direct access to consumer credit information.

(4)   The Defendant shall obey the immigration laws and comply with the directives of immigration authorities.

A special assessment of $100, payable to the United States, is mandatory and shall be due immediately.

29

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.

It is ordered that the Defendant make restitution to the victims of his crime totaling $454,943.99, jointly and severally with his co-defendants, provided that no further payment shall be required after the sum of the amounts actually paid by all defendants has fully covered all of the compensable injuries. The Court adopts the listing of sustained losses compensable under the Victim and Witness Protection Act as indicated in the PSR. Any payment made by the Defendant shall be divided among the persons named in proportion to their compensable injuries.

The Defendant shall forfeit to the United States, pursuant to 18 U.S.C. §§ 982 and 1029, all property real and personal involved in the offense or traceable to such property.

30

        The terms of this sentence are subject to modification
at the sentencing hearing scheduled for November 3, 2011.


        It is so ordered.

New York, NY
October 28 , 2011                     ROBERT W. SWEET
                                          U.S.D.J.

31